## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KVK TECH, INC.,

    Plaintiff,

  v.

MALLINCKRODT LLC and
SPECGX, LLC,

    Defendants.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff KVK Tech, Inc. ("**KVK**") brings this action against Defendants Mallinckrodt LLC ("**Mallinckrodt**") and SpecGX, LLC ("**GX**," and together with Mallinckrodt, collectively referred to as "**Defendants**") and, in support, states as follows:

## INTRODUCTION

1. This is a civil action for breach of contract and unlawful conduct by Defendants aimed at restraining fair competition by refusing to supply two medications to KVK. Defendants' refusal to deal with KVK is an improper means of maintaining their monopoly over these medications, and/or an attempt to monopolize these markets, with an effect of substantially reducing competition related to the distribution of such medications in the United States, in violation of federal antitrust laws.

2. KVK, Mallinckrodt, and GX (Mallinckrodt's wholly owned subsidiary) each develop, manufacture, and distribute FDA-approved finished dosage form medications ("**FDFs**") for pain treatment.  Their customers are located across the United States.

3.     Mallinckrodt also manufactures Active Pharmaceutical Ingredients ("**APIs**"), the primary raw material in a prescription drug FDF.

4.      Although the companies are direct competitors on developing, manufacturing, and distributing the relevant FDFs, KVK has been a Mallinckrodt/GX API customer since at least 2015.

5.     Recently, however, Defendants suddenly halted their supply of all API products to KVK, without a legitimate reason and with the sole intent of excluding FDF competition.

6.     As set forth in more detail below, KVK and Defendants fully negotiated and entered into an agreement for the purchase of Acetaminophen USP ("**APAP**") by KVK from GX in 2015. Since that time, KVK has purchased APAP from Defendants every year, in large quantities.

7.     During this same time period, Defendants' representatives actively solicited KVK to purchase Defendants' Oxycodone Hydrochloride USP ("**Oxycodone**") API, which KVK did in 2024.

8.     During this period, Mallinckrodt and GX were the U.S. generic market leaders in (i) FDF immediate release Oxycodone tablets;(ii) Oxycodone with APAP tablets; and (iii) Hydrocodone with APAP tablets.  Indeed, during the relevant period, Defendants had as much as 72% market share on one strength of Hydrocodone with APAP, 66% market share on another strength of Hydrocodone with APAP, and 60% market share on yet another strength of Hydrocodone with APAP. In total, Defendants control approximately 67% of the entire Hydrocodone APAP tablet market. In addition, Defendants possess approximately 61% of the market share of the combined market of (i) Hydrocodone with APAP tablets and (ii) Oxycodone with APAP tablets.

9.      In order to purchase and distribute Oxycodone, KVK was required to obtain, and did obtain, a Quota from the U.S. Drug Enforcement Administration ("**DEA**").[1]

10.     GX agreed to deliver the ordered APAP API and the Oxycodone API by November 14, 2024, and December 31, 2024, respectively, based on deadlines imposed by the DEA Quota and based on KVK's need to fulfill its customers' demands.

11.     GX has failed and refused to deliver the APAP API and the Oxycodone API to KVK, in breach of the parties' agreement, which has directly caused, and continues to cause, substantial damages to KVK.

12.     In fact, GX inexplicably and abruptly halted the sales of its APAP API to KVK, even though KVK had purchased APAP API from Defendants regularly for nearly a decade. Upon information and belief, this was a profitable relationship between KVK and Defendants.

13.     As a purported justification for their abrupt cessation of sales to KVK, Defendants claimed that KVK needed to be "qualified" as a customer and undergo a supposed comprehensive compliance review—despite the parties' long-standing course of dealing of not requiring any such qualification or review.

14.     Nevertheless, KVK provided Defendants with all the information they requested to complete their supposed qualification review.

15.     In fact, upon KVK's multiple requests for updates as to the delivery of the APIs, Defendants' representatives continued to mislead KVK by stating that the compliance review was

---

[1] A DEA Quota refers to the limits set by the DEA on the amount of certain controlled substance APIs that can be manufactured and imported into the United States. The system also limits the amount of finished product that manufacturers like KVK can make per year. The purpose of the Quota system is to (i) ensure adequate supply of a drug for legitimate medical, scientific, and industrial needs, and (ii) to prevent oversupply. A manufacturer's underproduction can affect future DEA Quota allocations to that manufacturer.

moving along and that GX would eventually deliver the APIs as soon as possible, which never happened.

16.     KVK relied to its detriment on Defendants' promises that they would deliver APIs as negotiated and, consequently, took actions including (i) seeking and obtaining—at considerable cost—necessary government approvals, and (ii) accepting purchase orders for the medications from dozens of customers nationwide, which remain pending. Importantly, Defendants knew from years of prior contractual relations that KVK would take such actions in reliance upon Defendants' promises.

17.     Further, Defendants' actions in unjustifiably and abruptly halting the supply of Oxycodone and APAP to KVK while misleading KVK regarding the status of its orders were intentional and anticompetitive, in violation of the federal antitrust laws. Indeed, Defendants have willfully engaged in this anticompetitive conduct with the specific intent of monopolizing the market for the manufacture and sale of pain pills containing Oxycodone and the APAP in the United States by controlling the availability of these medications in the market and excluding competition. Defendants' unlawful conduct risks causing shortages of these medications for patients who need them and/or allowing Defendants to raise prices to supracompetitive levels.

18.     As a result of Defendants' actions, KVK has suffered and continues to suffer damages, including but not limited to (i) loss of profit from the sale of the medications to KVK's customers; (ii) out-of-pocket expenses in securing regulatory approvals; and (iii) contractual and civil penalties for failure to supply the subject medications to its customers.

## THE PARTIES

19.     Plaintiff KVK is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 110 Terry Drive, Newtown, Pennsylvania, 18940.

20.     Defendant Mallinckrodt LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 385 Marshall Avenue, Webster Groves, Missouri, 63119.  Upon information and belief, Mallinckrodt LLC's sole member is Mallinckrodt Enterprises LLC, a Delaware limited liability company with its principal place of business in Missouri.  Upon information and belief, Mallinckrodt Enterprises LLC's members are Mallinckrodt Enterprises Holding, Inc., a California corporation with its principal place of business in Missouri, Ludlow Corporation, a Massachusetts corporation with its principal place of business in Missouri, and Mallinckrodt ARD Finance LLC.  Upon information and belief, Mallinckrodt ARD Finance LLC's sole member, Mallinckrodt ARD Inc., is a California corporation with its principal place of business in New Jersey.  Upon information and belief, none of Mallinckrodt's members is a citizen of Pennsylvania.

21.     Defendant SpecGX LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 385 Marshall Avenue, Webster Groves, Missouri, 63119.  GX's sole member is Mallinckrodt LLC.

22.     At all times material hereto, Defendants have conducted substantial business in the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

23.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between citizens of different States.

24.    The Court also has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Count IV of this Complaint, which seeks relief pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and has subject-matter jurisdiction over the remaining causes of action in this case under the principles of supplemental jurisdiction codified at 28 U.S.C. § 1367(a).  This Court's exercise of supplemental jurisdiction over KVK's state law claims would avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

25.    The Court has personal jurisdiction over Defendants and venue is appropriate in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and pursuant to 28 U.S.C. § 1391(b)(2), because the actions, omissions, events, and transactions giving rise to the claims asserted herein transpired in this judicial district and Defendants have engaged in business within this district.

## FACTUAL ALLEGATIONS

26.    KVK is a United States–based company focused on the development and manufacture of high-quality, FDA-approved generic medicines.

27.    KVK supplies FDA-approved medicines, including Oxycodone and APAP, to customers all over the United States.

28.    KVK has been a Mallinckrodt customer since at least in or around 2015, having regularly purchased APAP APIs from Mallinckrodt and its affiliates for approximately a decade,

for use in approved ANDA (Abbreviated New Drug Application)[2] products. Because of FDA ANDA requirements, as well as DEA requirements, KVK cannot simply switch API suppliers.

29.    KVK originally purchased API from Mallinckrodt. However, in or around 2021, Mallinckrodt began selling its APIs under the GX label. Nonetheless, Mallinckrodt's agents continued to negotiate and to make decisions regarding purchases on behalf of GX, representing themselves as agents of both Mallinckrodt and GX, including with regard to the APIs at issue here. Additionally, GX sells its FDFs with a Mallinckrodt label.

30.    Mallinckrodt and its subsidiary, GX, together hold the largest share of the national market for the manufacture of FDF (i) immediate release oxycodone with APAP tablets; and (ii) immediate release hydrocodone with APAP tablets (collectively, "**FDF Products**").

31.    In addition to possessing a dominant market share of the manufacture of FDF Products, Defendants also possessed the ability to exclude competition by way of their control over a substantial amount of the API that is required to manufacture the FDF Products. In fact, as of December 2024, Defendants had as much as 72% market share on one strength of Hydrocodone with APAP, 66% market share on another strength of Hydrocodone with APAP, and 60% market share on yet another strength of Hydrocodone with APAP. In total, Defendants control approximately 67% of the entire Hydrocodone APAP market. Defendants possess approximately 61% of the FDF Products market.

32.    Furthermore, it is difficult to find other suppliers of these products, and, because of FDA requirements, KVK cannot simply switch to another supplier. These restrictions are

---

[2] An ANDA is a written request filed with the U.S. Food and Drug Administration ("**FDA**") to market a generic drug.

compounded by DEA regulations, which require that all Schedule II controlled substance API be manufactured in the United States, thus reducing the field of potential suppliers

33.     KVK has increasingly become a direct competitor of Mallinckrodt and GX on these FDF Products, although with a much smaller market share than that held by Defendants for each one. KVK is dependent upon Defendants' API to manufacture many of its FDF Products.

34.     In or around 2022, KVK began purchasing GX's Oxycodone API for use in KVK's ANDA products, particularly Oxycodone IR 5mg, 10mg, 15mg, 20mg, and 30mg tablets, and Oxycodone with APAP 5mg/325mg and 10mg/325mg (together, the "**Oxycodone Products**"). Before the events giving rise to this Complaint, KVK had purchased, paid for, and received over 200 kg of Oxycodone API from Mallinckrodt.

35.     As described above, KVK is Mallinckrodt's main competitor in the marketing and sale of the Oxycodone Products.

36.     In order to purchase, handle, and commercialize Oxycodone, KVK is required to obtain a DEA Certificate of Available Procurement Quota ("CoAPQ").

37.     Additionally, in order to utilize a new source of API for any FDF Products, including Oxycodone, a manufacturer such as KVK must file a PAS (Prior Approval Supplement)[3] with the FDA and obtain an approval.

38.     As a leading manufacturer and seller of API for FDF Products, including Oxycodone API, Defendants are aware of the difficulties and delays that would result if KVK were forced to identify a new source of API for any FDF Product.

---

[3] This is a type of supplement to an ANDA application that requires FDA approval before a generic drug manufacturer such as KVK can, *inter alia*, utilize a new API supplier in an approved FDF product.

### A. KVK's Purchase of Oxycodone API from GX

39.     In or around April 2024, KVK's and Defendants' representatives began discussions concerning KVK's intent to purchase approximately 840 kg of Oxycodone API from GX. Defendants provided KVK with a pricing proposal for the Oxycodone API, which KVK accepted.

40.     Eric Davis ("**Mr. Davis**"), Mallinckrodt's Director of Key Accounts, acknowledged KVK's request and inquired regarding KVK obtaining a DEA Quota for the purchase.

41.     In response to Mr. Davis's requests, KVK applied for and obtained the necessary PAS and a DEA Quota for the purchase of the subject Oxycodone API. KVK informed Defendants that it had obtained the DEA Quota, and that the product needed to be delivered by December 31, 2024, the expiration date of the DEA Quota.

42.     GX agreed to sell Oxycodone API to KVK as authorized by the DEA Quota.

43.     Thereafter, Mr. Davis informed KVK for the first time that Mallinckrodt's "Compliance Quality Team" would need to qualify KVK as a customer before selling it Oxycodone API, notwithstanding that KVK had been an existing customer since 2015 and had not previously been required to undergo any such qualification.

44.     KVK immediately—by no later than October 21, 2024—supplied all the information requested by GX for the purported customer qualification process. During these discussions, Mr. Davis repeatedly assured KVK's representatives that Mallinckrodt and GX's quality department was moving forward with its review and that the process would be completed promptly.

45.     On November 6, 2024, in reliance upon the above representations by Defendants and based on its having obtained the DEA Quota, KVK issued a purchase order to GX for 655 kg

of Oxycodone API, for a specified total and per unit price, to be delivered to KVK in Newtown, Pennsylvania ("**Oxycodone PO**"). In fact, the Oxycodone PO was issued at the request of Mr. Davis in response to KVK's requests for any updates.

46.     KVK neither had reason to nor sought an alternative source of API supply, as Mr. Davis had consistently represented that Defendants would deliver the API pursuant to the Oxycodone PO.

47.     Defendants were at all times aware that KVK planned to use this Oxycodone API to directly compete with Defendants on the Oxycodone Products.

48.     Notwithstanding the above, on or about November 6, 2024, Mr. Davis abruptly advised KVK that GX would not deliver the requested API by December 31, 2024 (the date on which KVK's DEA Quota, and thus its ability to acquire the Oxycodone API, would expire and indeed expired), but assured KVK that GX would still deliver the APIs soon.

49.     To date, GX still has not delivered the Oxycodone APIs ordered by KVK, in breach of the agreement between GX and KVK, as evidenced by the Oxycodone PO. In fact, Defendants continued to offer vague responses to KVK's requests for updates on the anticipated delivery, while at the same time continually promising delivery, until approximately January 1, 2025, when all communication ceased.

50.     Defendants' dilatory actions were clearly intentional, with the purpose of misleading KVK without any intention to fulfill their promise to supply the Oxycodone API to KVK.

51.     Indeed, Defendants are aware of the complexity and burdens of obtaining a DEA Quota. Specifically, KVK needs to provide detailed information to satisfy all factors reviewed by the DEA, which include intended activities, manufacturing process, quota allocation, disposal

rates, inventories, projected demand, potential diversion, and information from other agencies. Defendants further understood that if they did not deliver the Oxycodone API by December 31, 2024, as promised, KVK would lose that DEA Quota and with it the ability to manufacture a significant amount of the Oxycodone Products to fill customer orders and compete with Mallinckrodt.

52.     Despite knowing of KVK's efforts to obtain the DEA Quota to purchase Oxycodone from GX and of the DEA Quota's expiration deadline, Defendants' actions and deliberate inaction caused KVK's DEA Quota to lapse.

**B.  *KVK's Purchase of APAP API from GX***

53.     Since 2015, KVK regularly purchased APAP APIs from Defendants, by receiving a pricing proposal from Defendants, accepting it, and issuing a purchase order to evidence the transaction.

54.     On August 16, 2024, KVK issued a purchase order to GX for 6,000 kg of APAP, for a specified total and per unit price, to be delivered to KVK by November 14, 2024 ("**APAP PO**"). The APAP PO was issued upon KVK's acceptance of a pricing proposal received from Defendants, and it provided for delivery of the APIs no later than November 14, 2024.

55.     On August 19, 2024, GX confirmed receipt of the APAP PO and the processing of the respective order number 70354366 and issued an "Order Acknowledgement" with invoice number SO70354366.

56.     Thereafter, GX and KVK engaged in negotiations for new pricing for the year 2025 for APAP, to be applied to any future purchase orders. The parties agreed to lower pricing per kilo, and KVK would increase its purchase volumes from 12 MT[4] to 50 MT in 2025. The parties agreed

_____

[4] "MT" means metric ton, a unit of measurement equal to 1,000 kilograms.

to a guarantee that 80% of KVK's annual purchase of APAP in 2025 would be at the new price. Based on these negotiations, KVK issued two additional purchase orders, nos. 064076 and 064077, with the new price and for additional APAP APIs ("**Additional APAP POs**"). GX acknowledged receipt of the Additional APAP POs, and stated they were being processed.

57.     On September 26, 2024, KVK requested an update from GX regarding delivery of the APAP that was the subject of the APAP PO.

58.     On September 30, 2024, Mr. Davis responded by sending a Suspicious Order Monitoring Questionnaire ("**SOMQ**") for KVK's completion, which had not been required to be completed in connection with prior purchase orders.

59.     Suspicious Order Monitoring ("SOM") is a requirement for purchasing controlled substances under the Controlled Substances Act whereby a DEA registrant must (i) design and operate a system to identify suspicious orders for the registrant; (ii) ensure that the system complies with applicable federal and State privacy laws; and (iii) upon discovering a suspicious order or series of orders, notify the Administrator of the DEA and the Special Agent in Charge of the Division Office of the DEA for the area in which the registrant is located or conducts business, pursuant to 21 U.S.C. § 832(a). Suspicious orders may include, but are not limited to, orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency, pursuant to 21 U.S.C. § 802(57). Furthermore, all applicants and registrants must maintain effective controls and procedures to guard against theft and diversion, pursuant to 21 C.F.R. § 1301.71(a).

60.     As DEA registrants, KVK, Mallinckrodt, and GX must maintain SOM programs related to their sales of controlled substances.  As part of an effective SOM system, firms often issue questionnaires to their potential customers to determine whether the customer has sufficient

procedures and infrastructure to be able to purchase controlled API or FDF without significant risk of diversion, much like GX's September 30, 2024, SOMQ.

61.    While GX's SOMQ questionnaire is an appropriate prerequisite to the sale of a Schedule II Controlled Substance API, it is entirely irrelevant to the sale of non-controlled API like APAP, as evidenced by the fact that Mallinckrodt and GX had been selling APAP to KVK for a decade without issuing any such questionnaire.

62.    Nevertheless, on October 2, 2024, KVK promptly sent back the completed SOMQ, as well as its response to a Customer Due Diligence Questionnaire that GX separately requested KVK to complete. After receiving these items from KVK, GX requested additional compliance information, which KVK, again, promptly provided.

63.    On October 4, 2024, Mr. Davis requested additional compliance information purportedly to complete the SOMQ process, which KVK promptly and accurately provided.

64.    On October 7, 2024, Scott Collier, Director of Controlled Substances Compliance at GX and Mallinckrodt, requested additional compliance information by e-mail, purportedly to complete the SOMQ process, which KVK, as it had done on numerous prior occasions, promptly and accurately provided.

65.    On October 11, 2024, Mr. Collier followed up by e-mail to request additional compliance information, purportedly to complete the SOMQ process.  Again, KVK promptly and accurately provided the requested information.

66.    On October 24, 2024, KVK personnel spoke by telephone with Mr. Collier concerning the SOMQ, during which telephone call KVK personnel provided Mr. Collier with additional information regarding KVK's SOM program.

67.    Following the October 24, 2024, telephone call, neither Mr. Collier nor any representative of GX or Mallinckrodt made any further inquiry into the adequacy of KVK's SOM program or its responses to the SOMQ and Customer Due Diligence Questionnaire, even after KVK repeatedly inquired of the status.

68.    Indeed, following the October 24, 2024, telephone call, KVK believed it had satisfied GX's and Mallinckrodt's requests for information, thereby demonstrating the adequacy of its SOM program.

69.    As a controlled substance manufacturer, KVK has a robust SOM program in place—one that is compliant under the Controlled Substances Act and meets all criteria necessary for Mallinckrodt and GX to sell the Oxycodone API or any other controlled substance to KVK.

70.    Moreover, KVK fully and accurately responded to all of the questions posed by GX and Mallinckrodt in the Customer Due Diligence Questionnaire and the SOMQ.

71.    As relevant here, in response to a question on the SOMQ that asked, "Does your company have a documented Suspicious Order Monitoring Program (SOMP) that complies with 21 CFR 1301.74(b)?," KVK responded, "Yes."

72.    Further, in response to a question on both the SOMQ and Customer Due Diligence Questionnaire that asked, "Is your company under any form of monitorship, court-ordered, or agreed upon compliance obligations?," KVK responded, "Yes."

73.    KVK is currently a party to a monitorship agreement with the U.S. Department of Justice. The terms of the monitorship are publicly available, and are in fact posted on KVK's website.

74.    The monitorship is unrelated to the Controlled Substances Act, DEA regulations, KVK's SOM program, or any purported violation thereof. Indeed, the monitorship bears no

connection to KVK's interactions with controlled substances, and has no responsibility in relation thereto.

75.     At no point during the parties' correspondence regarding the SOMQ, Customer Due Diligence Questionnaire, or KVK's SOM program, did Mr. Collier or anyone else from Mallinckrodt or GX raise any issues with a publicly disclosed monitorship that was not ordered on account of the mishandling of controlled substances.

76.     Following the October 24, 2024, telephone call, KVK repeatedly asked Defendants about the shipping information for the APIs purchased under the APAP PO.

77.     To date, the APAP APIs have not been delivered, in breach of the APAP PO between GX and KVK. Moreover, despite requests from KVK, GX has refused to provide any substantive information regarding the status of this order.

78.     Additionally, GX has never provided any information to KVK regarding the status of the processing of the Additional APAP POs.

79.     Defendants' sudden cessation in their longstanding supply of APAP to KVK, after having engaged KVK in a monthslong process of requesting various and often unnecessary safeguards, was intended to delay and ultimately mislead KVK, not to mention in breach of Defendants' contractual promise to supply the APAP to KVK.

*C. Defendants' Actions Are Harming KVK and the FDF Products Market*

80.     Defendants control a high and dominant share of the FDF Products market nationwide.

81.     For example, as of December 2024, Defendants had as much as 72% market share on one strength of Hydrocodone with APAP, 66% market share on another strength of Hydrocodone with APAP, and 60% market share on yet another strength of Hydrocodone with

APAP. In total, Defendants control approximately 67% of Hydrocodone APAP market. In addition, Defendants possess approximately 61% of the market share of the FDF Products market.

82. Defendants' market share on the relevant products will only further increase, as their conduct forecloses KVK from competing in the market.

83. In addition to Defendants' significant market share in the FDF Products market, Defendants also possess the ability to exclude competition in the same market due to their control over a significant share of the relevant API market, which is required to manufacture the FDF Products.

84. Defendants are one of only several suppliers of the API required to manufacture the FDF Products, and likely one of only two who can supply KVK's market requirements.

85. KVK is a competitor of Defendants in the manufacture, sale, and distribution of the FDF Products; however, KVK also relies on the purchase of Defendants' APAP and Oxycodone API products in order to manufacture and distribute KVK's formula of the FDF Products, which has been a profitable engagement for all parties for several years.

86. Defendants are aware that their refusal to deal with and to sell the FDF Product API to KVK will cause and has caused KVK substantial delay in attempting to find an alternative source for the API, and that KVK will lose significant sales of FDF Products in the meantime.

87. Such delays are exacerbated by the fact that KVK lost a significant portion of its Oxycodone DEA Quota when the Defendants failed to ship the Oxycodone API by December 31, 2024, pursuant to the Oxycodone PO.

88. Defendants' refusal to sell their API to KVK severely restricts KVK's ability to manufacture and distribute the FDF Products, including those where KVK competes directly with Defendants.

89.     KVK supplies its FDF Products to wholesalers and distributors all over the United States on an ongoing basis and does so based on the volume of materials it receives from its suppliers, as authorized by the applicable government regulatory agencies.

90.     For example, in reliance upon the purchase orders negotiated with Defendants, KVK has received and accepted over 450 purchase orders from its customers for Oxycodone and APAP, placed between September 2024 and May 2025, in the total amount of over $1.5 million.

91.     KVK has thus far been unable to fulfill its commitments to its customers, and therefore, thousands of medical patients nationwide have been, and will continue to be, negatively impacted with potential shortages of much-needed medications, and KVK has incurred and will further incur damages in the form of lost sales and diminished DEA Quota.

92.     KVK's inability to meet these commitments is due directly to Defendants' unjustifiable breach of its agreement to ship the API.

93.     In addition, KVK's inability to fulfill its commitments to its customers limits the choices of FDF Products available to customers and ultimately limits the choices of FDF Products available to end user patients.

**D.  *The Federal Supply Schedule***

94.     The Federal Supply Schedule ("**FSS**") is a federal contracting tool used to ensure supply of commercial supplies/services to various federal agencies by way of long-term contracts. The FSS is administered by the General Services Administration ("**GSA**").

95.     In the generics context, a typical FSS contract award lasts five years and is highly pursued by generic pharmaceutical manufacturers like KVK and the Defendants.

96.     On or about February 1, 2024, the Defense Logistics Agency issued a request for proposal for an FSS contract for Hydrocodone with APAP (the "**FSS Contract**").  The bid for the FSS Contract was due on May 8, 2024.

97.     On May 8, 2024, KVK submitted its bid through its partner, the Stronghold Group. Upon information and belief, Defendants knew that KVK submitted its bid on the FSS Contract through the Stronghold Group. The bid covered the following products:

- Hydrocodone-Acetaminophen 5MG-325MG – 100 Count
- Hydrocodone-Acetaminophen 5MG-325MG – 500 Count
- Hydrocodone-Acetaminophen 7.5MG-325MG – 100 Count
- Hydrocodone-Acetaminophen 7.5MG-325MG – 500 Count
- Hydrocodone-Acetaminophen 10MG-325MG – 100 Count
- Hydrocodone-Acetaminophen 10MG-325MG – 500 Count

98.     Upon information and belief, Defendants were the incumbent suppliers on the FSS Contract.  They submitted a bid to retain that contract for an additional five years.

99.     The bidding process was still active in the fall of 2024 as the FSS Contract had not yet been awarded.

100.     APAP was the largest API in the FSS Contract.

101.     The Defendants' sudden and inexplicable refusal to sell APAP to KVK, a non-controlled API that Defendants had supplied without interruption for a decade, coincided with the parties' competing bid for the FSS Contract.

102.     Defendants' refusal to supply the contractually agreed-upon APAP API to KVK would have restricted KVK's ability to perform under the FSS Contract had KVK eventually been awarded it.

103.     Upon information and belief, Defendants refused to ship APAP to KVK in order to prevent KVK from bidding on the FSS Contract or, failing that, to prevent KVK from being able

to perform the FSS Contract if awarded. Either way, Defendants would be unjustly financially enriched.

104.    Defendants' sudden, inexplicable refusal to sell their APAP API to KVK during this same timeframe prevented KVK from fully and fairly competing against Defendants for the FSS Contract for the Hydrocodone with APAP.

105.    Defendants were eventually awarded the FSS Contract (Contract ID SPE2D2-25-D-0007), thus further enhancing and maintaining Defendants' monopoly in the FDF Products market and harming the consumers of the FDF Products—e.g., the United States of America and the Department of Veterans Affairs patients who rely upon these medications supplied through the FSS contracts.

106.    The stated public value of the FSS Contract is $29,250,715.95.

107.    The result of Defendants' intentional unlawful conduct is to further maintain (or attempt to maintain) their dominant market share in the FDF Products industry, which results in fewer choices to customers and could allow Defendants to charge customers higher prices.

108.    Such damages further enrich Defendants by depriving KVK of its ability to supply its customers while enabling Defendants to poach those very customers and steal KVK's market share.

109.    Additionally, KVK is exposed to monetary penalties from its customers for failure to supply the much-needed medications. Such penalties can be two to three times the actual sale price of KVK's products.

110.    Defendants have not provided any legitimate reason for their refusal to supply the ordered Oxycodone and/or APAP to KVK, resulting in harm to KVK and the public.

111.    Despite multiple demands by KVK, including a letter sent on December 9, 2024, Defendants have failed and refused to deliver the subject APIs or to provide any reasonable explanation for their refusal to supply the APIs.

112.    As a result of Defendants' above actions, KVK has suffered and continues to suffer damages which include but are not limited to: (i) loss of profit from the sale of the medications to KVK's customers (including, but not limited to, the FSS Contract); (ii) out-of-pocket costs in securing the necessary regulatory approvals; and (iii) contractual and civil penalties for failure to supply the subject medications to its customers.

### COUNT I
**Breach of Contract—Oxycodone PO**
*(Against Defendant GX)*

113.    KVK realleges and reasserts each of the preceding allegations as if fully set forth herein.

114.    GX and KVK entered into an agreement evidenced by the Oxycodone PO, for the purchase of Oxycodone by KVK from GX, which is valid and enforceable against GX.

115.    At all relevant times, KVK acted in accordance with the agreement with GX, by seeking and obtaining the necessary government approvals, by issuing the Oxycodone PO, and by providing GX with all necessary compliance information.

116.    Pursuant to their agreement, GX agreed to deliver 655 kg of Oxycodone, for a specified total and per unit price, to KVK in Newtown, Pennsylvania, no later than December 31, 2024.

117.    KVK would make the agreed upon payment upon delivery of the Oxycodone by GX.

118.    GX materially breached its agreement with KVK, by failing to deliver the Oxycodone by the due date, and by failing to deliver the Oxycodone at all as of the date of this Complaint.

119.    GX is in default of its obligations under the agreement with KVK.

120.    As a direct and proximate result of GX's material breach of the agreement with KVK, KVK has suffered damages in excess of $75,000.

121.    All conditions precedent have been performed or have occurred in order for KVK to bring this action.

**COUNT II**
**Breach of Contract—APAP PO**
*(Against Defendant GX)*

122.    KVK realleges and reasserts each of the preceding allegations as if fully set forth herein.

123.    GX and KVK entered into an agreement evidenced by the APAP PO, for the purchase of APAP by KVK from GX, which is valid and enforceable against GX.

124.    At all relevant times, KVK acted in accordance with the agreement with GX, by seeking and obtaining the necessary government approvals, by issuing the APAP PO, and by providing GX with all necessary compliance information.

125.    Pursuant to their agreement, GX agreed to deliver 6,000 kg of APAP, for a specified total and per unit price, to KVK in Newtown, Pennsylvania, no later than November 14, 2024.

126.    KVK would make the agreed upon payment upon delivery of the APAP by GX.

127.    GX materially breached its agreement with KVK, by failing to deliver the APAP by the due date, and by failing to deliver the APAP at all as of the date of this Complaint.

128.    GX is in default of its obligations under the agreement with KVK.

129.    As a direct and proximate result of GX's material breach of the agreement with KVK, KVK has suffered damages in excess of $75,000.

130.    All conditions precedent have been performed or have occurred in order for KVK to bring this action.

## COUNT III
### Promissory Estoppel, in the alternative
*(Against Both Defendants)*

131.    KVK realleges and reasserts each of the preceding allegations as if fully set forth herein.

132.    Defendants provided pricing proposals and negotiated with KVK the purchase and sale of Oxycodone and APAP.

133.    With regard to Oxycodone, Defendants were aware of the necessary DEA Quota and PAS for KVK to be able to purchase and distribute Oxycodone products. In fact, on behalf of Defendants, Mr. Davis inquired regarding KVK's approvals for the transaction.

134.    With regard to APAP, Defendants and KVK had successfully negotiated and executed on the purchase and sale of such APIs on several previous occasions, following the same course of dealing.

135.    Defendants promised KVK that Oxycodone and APAP would be delivered by the agreed upon dates pursuant to the respective purchase orders.

136.    Defendants knew that KVK needed the Oxycodone and APAP to supply its customers, which included dozens of distributors and wholesalers all over the United States.

137.    By making the above promises, Defendants reasonably expected that KVK would take action to (i) apply for and obtain the necessary government approvals, and (ii) accept orders

from its customers for the oxycodone and APAP products stemming from the APIs purchased from GX.

138.    Indeed, KVK detrimentally relied on Defendants' promises in order to take the above-mentioned actions.

139.    GX has failed and refused to deliver the Oxycodone and APAP pursuant to the promises made by Defendants to KVK.

140.    KVK has and continues to suffer damages as a result of Defendants' failure and refusal to comply with their promises to KVK, including, but not limited to, (i) loss of profits from the sale of the medications to KVK's customers; (ii) out-of-pocket costs in procuring and obtaining the necessary regulatory approvals; and (iii) contractual and civil penalties for failure to supply the subject medications to its customers.

141.    Enforcing the promises made by Defendants to KVK is necessary in order to prevent great injustice to KVK.

<u>**COUNT IV**</u>
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Monopolization and/or Attempted Monopolization)**
*(Against Both Defendants)*

142.    KVK realleges and reasserts each of the preceding allegations as if fully set forth herein.

### A. *The Relevant Geographic and Product Market*

143.    The relevant geographic and product market is the FDF Products market in the United States, which, as defined above, refers to the following specific FDF medications: (i) immediate release oxycodone with APAP tablets; and (ii) immediate release hydrocodone with APAP tablets.

144.    Defendants have monopoly power in the FDF Products market in the United States, including the power to control prices and to exclude competition. For example, as of December 2024, Defendants had as much as 72% market share on one strength of Hydrocodone with APAP, 66% market share on another strength of Hydrocodone with APAP, and 60% market share on yet another strength of Hydrocodone with APAP.  In total, Defendants control approximately 67% of the entire Hydrocodone APAP Market.  In addition, Defendants possess approximately 61% of the FDF Products market.

145.    KVK supplies FDF Products to customers all over the United States. In fact, KVK's customers who will be negatively affected by Defendants' actions have issued in excess of 450 purchase orders for the subject medications from a number of States including, but not limited to, Pennsylvania, Colorado, California, Massachusetts, Utah, Arizona, Washington, Oklahoma, Tennessee, and Georgia. Defendants also supply the same medications to the same States as KVK. By eliminating a competitor, Defendants will cause shortages of FDF Products in the above market, directly affecting the medical patients which are the ultimate recipients of the FDF Products supplied by KVK.

146.    With regard to Oxycodone products, the relevant market is further comprised of a limited number of suppliers due to Oxycodone being a highly regulated drug, the availability and volume of distribution of which are limited by the DEA. Indeed, there is a limited number of companies that are authorized by the appropriate government authorities to manufacture and to sell Oxycodone at all in the United States. As a result, competition is already limited by the applicable regulations, making any monopolization of the market by one company potentially disastrous for the consumer.

147.    Additionally, the choice of these FDF Products is largely determined by physicians and is based on the medical needs of the patient, not on the relative cost, the brand, or the manufacturer of the medication. In other words, patients do not have the ability to choose to buy from a specific brand or manufacturer based only on price or quality difference, but only on availability. In fact, patients need these FDF Products, when prescribed by physicians, to manage their health conditions, regardless of price or quality available. This is especially true with regard to medications containing Oxycodone.

148.    Accordingly, a monopolist can impose a small, but significant, price increase in the pricing of these FDF Products in the relevant product markets without causing patients to switch to a different supplier or other drug options, because the patients cannot switch. As such, a price increase by a monopolist will only negatively impact the accessibility to these FDF Products by patients who need them.

### B. Defendants' Anticompetitive Actions

149.    As explained above, Defendants have willfully engaged in anticompetitive conduct with the specific intent of monopolizing the FDF Products market in the United States, by suddenly refusing to deal with KVK in supplying the Oxycodone and APAP APIs, without a legitimate business reason and despite, upon information and belief, having established a previously profitable course of dealing with KVK for several years.

150.    Additionally, despite being aware of the efforts implemented by KVK to obtain the DEA Quota specifically for the Oxycodone to be purchased from GX and of the expiration deadline of the respective DEA Quota, upon information and belief, Defendants intentionally caused KVK's DEA Quota to be surrendered for anticompetitive purposes.

151.    In addition, upon information and belief, Defendants intentionally withheld shipments of APAP to KVK in order to prevent KVK from bidding on the FSS Contract or, failing that, to prevent KVK from being able to perform the FSS Contract if it were eventually awarded to KVK.

152.    Defendants' conduct does not benefit consumers but, instead, hurts the FDF Products market in the United States by causing shortages of much needed medications.

153.    The anticompetitive conduct described herein was undertaken by Defendants to maintain its monopoly power, or to create a dangerous probability that Defendants will achieve monopoly power, in the FDF Products market in the United States.

154.    There is no procompetitive or legitimate business justification for Defendants' anticompetitive conduct that outweighs its anticompetitive effects, namely the foreclosure of competition in the FDF Products market in the United States. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

## C.  Antitrust Injury

155.    Defendants' refusal to deal with KVK was done with the intent of monopolizing the FDF Products market in the United States and will injure KVK in its business by leveraging control over the availability of essential pharmaceutical products to exclude competition and to steer customers to suppliers owned or controlled by Defendants.

156.    Moreover, the Defendants' actions caused KVK to lose actual sales to existing customers that placed orders KVK was unable to fill due to Defendants' refusal to provide the necessary API.

157.    The Defendants' actions also served to prevent KVK from winning the FSS Contract.

158.    The injury to KVK was a foreseeable consequence of Defendants' refusal to deal with KVK, which was done with the intent of monopolizing the FDF Products market in the United States.

159.    Moreover, the injury to KVK and to consumers is of the type that antitrust laws are intended to prevent. Among other things, Defendants' dominant control over the availability of Oxycodone and APAP products in the market will allow Defendants to steer consumers of these medications away from rivals. All the while, Defendants will have the power to raise prices and reduce quality through lessened competition. Defendants' refusal to deal with KVK is the material cause of these antitrust injuries.

160.    As a result of Defendants' above actions, KVK has suffered and continues to suffer damages which include, but are not limited to: (i) loss of revenue from the sale of the medications to KVK's customers; (ii) out-of-pocket costs in procuring and obtaining the necessary regulatory approvals; and (iii) contractual and civil penalties for failure to supply the subject medications to its customers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff KVK respectfully requests that this Court enter judgment in its favor and against Defendants GX and Mallinckrodt on Counts I through IV above, in an amount to be proven at trial, plus applicable interest, costs, and reasonable attorney's fees pursuant to Section 4 and 16 of the Clayton Act, along with any such other and further relief as this Court deems just including enhanced/treble damages.

## DEMAND FOR JURY TRIAL

Plaintiff KVK Tech, Inc., hereby requests a jury trial on any and all claims and issues so triable.

Dated: November 5, 2025.                    Respectfully submitted,


      */s/ Patrick J. Loftus*

Michael J. Rinaldi (Pa. 89693)
Patrick J. Loftus (Pa. 60417)
Andrew J. Rudowitz (Pa. 324201)
Nicholas A. DiMarco (Pa. 332632)
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, Pennsylvania  19103
(215) 979-1000 (telephone)
(215) 979-1020 (facsimile
mjrinaldi@duanemorris.com
loftus@duanemorris.com
ajrudowitz@duanemorris.com
nadimarco@duanemorris.com

Brian H. Pandya (D.C. 501661)
(*pro hac vice* application forthcoming)
901 New York Avenue, NW, Ste. 700 East
Washington, D.C.  20001
(202) 776-7807 (telephone)
(202) 776-7801 (facsimile)
bhpandya@duanemorris.com

Eric A. Boden (N.J. 502832025)
(*pro hac vice* application forthcoming)
40 Lake Center Drive
401 Route 73 North, Ste. 200
Marlton, New Jersey  08053
(856) 874-4216 (telephone)
eboden@duanemorris.com

*Attorneys for Plaintiff KVK Tech, Inc.*