**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KVK TECH, INC.,**<br>*Plaintiff,*<br><br>**v.**<br><br>**MALLINCKRODT LLC and SPECGX, LLC,**<br>*Defendants.* | **Civil No. 25-6269** |

**MEMORANDUM**

**Costello, J.** **September 28, 2026**

Plaintiff KVK Tech, Inc. and Defendants Mallinckrodt LLC and SpecGX, LLC are manufacturers of prescription pain medications. Throughout 2024, the parties allegedly negotiated and agreed upon two contracts for SpecGX to supply KVK with ingredients necessary to manufacture oxycodone and hydrocodone products. SpecGX never delivered those supplies. KVK subsequently filed suit against Defendants for breach of contract, promissory estoppel, and monopolization. Defendants moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As explained below, Plaintiff has stated plausible claims for breach of contract and promissory estoppel. However, Plaintiff has failed to state plausible claims for monopolization and attempted monopolization under the Sherman Act. Therefore, the Court will deny Defendants' motion as to Plaintiff's state law claims and grant the motion as to Plaintiff's antitrust claims without prejudice.

## I. BACKGROUND

The parties are manufacturers and distributors of FDA-approved finished dosage form medications ("FDFs") for pain treatment. ECF No. 1 ¶ 2. In addition to FDFs, Mallinckrodt

manufactures active pharmaceutical ingredients (APIs), including acetaminophen USP ("APAP") and oxycodone hydrochloride USP API ("Oxycodone API"). *Id.* ¶¶ 3, 6-7. These APIs are the primary raw materials necessary to manufacture FDFs. *Id.* ¶ 3. Mallinckrodt sells these APIs through SpecGX, its wholly owned subsidiary. *Id.* ¶¶ 2, 29. Since 2015, Plaintiff has purchased APAP from Defendants. *Id.* ¶ 28. Since 2022, Plaintiff has purchased Oxycodone API from SpecGX. *Id.* ¶ 34.

Plaintiff is Defendants' direct competitor in selling oxycodone products and related prescription pain medications. *Id.* ¶¶ 30, 33, 35. Specifically, they compete in selling immediate release oxycodone with APAP tablets and immediate release hydrocodone with APAP tablets ("FDF Products"). *Id.* ¶ 30. However, Plaintiff is entirely dependent on Defendants' API to manufacture its competing products. *Id.* ¶ 33.

**A. The Oxycodone API Contract Negotiations**

In April 2024, Plaintiff and SpecGX began negotiating a purchase of Oxycodone API. *Id.* ¶ 39. To that end, Plaintiff applied for and obtained a DEA Quota, which is necessary to purchase, handle, and commercialize any oxycodone product. *Id.* ¶¶ 36, 41. Plaintiff advised Defendants that its DEA Quota would expire on December 31, 2024. *Id.* ¶ 41. Despite the parties' previous dealings, Defendants informed Plaintiff that Mallinckrodt's compliance team would have to approve Plaintiff's Oxycodone API purchase. *Id.* ¶ 43. No later than October 21, 2024, Plaintiff supplied all information requested by Defendants for this customer qualification process. *Id.* ¶ 44.

On November 6, 2024, Defendants informed Plaintiff that they would be unable to deliver the API by December 31, 2024. *Id.* ¶ 48. Later that same day, Plaintiff sent a purchase

order for Oxycodone API to SpecGX. *Id.* ¶ 45. To date, Plaintiff has not received the Oxycodone API requested in its purchase order. *Id.* ¶ 49.

Because Plaintiff did not receive its Oxycodone API order by December 31, 2024, its DEA Quota expired, significantly limiting its ability to sell FDF Products in competition with Defendants. *Id.* ¶ 51. Plaintiff alleged that FDA and DEA requirements made switching API suppliers difficult, which prevented it from obtaining the Oxycodone API elsewhere before its quota expired. *Id.* ¶ 28. Moreover, Plaintiff notes that Defendants are one of the few suppliers of the API necessary to manufacture FDF Products and are likely one of only two who can meet Plaintiff's market requirements. *Id.* ¶ 84.

**B. The APAP Contract Negotiations**

On August 16, 2024, Plaintiff sent SpecGX a purchase order for a specified amount of APAP, of which SpecGX confirmed receipt. *Id.* ¶¶ 54-55. On September 30, 2024, Defendants sent Plaintiff a Suspicious Order Monitoring Questionnaire ("SOMQ") via email. *Id.* ¶ 58. Plaintiff alleged that this had not been previously requested for APAP orders. *Id.* Defendants informed Plaintiff that this change was due to an injunction issued against them because of their involvement in the Opioid Epidemic. ECF No. 26-9 at 6. DEA registrants, such as the parties, must maintain Suspicious Order Monitoring ("SOM") programs related to their sales of controlled substances. ECF No. 1 ¶ 60. Firms typically issue SOMQs to their potential customers to determine whether that customer has sufficient procedures to purchase and properly handle controlled substances or their APIs. *Id.* But APAP is not a controlled substance and so use of a SOMQ for its purchase is atypical. *Id.* ¶ 61.

Throughout October 2024, Plaintiff sent the information requested by Defendants to complete the SOMQ for its APAP purchase. *Id.* ¶ 62-75. After October 24, 2024, Defendants

ceased communications with Plaintiff regarding its order. *Id.* ¶ 76, 78-79. To date, Plaintiff has not received the APAP requested in its August 16 order, nor have Defendants provided any updates on the status of that order. *Id.* ¶¶ 77-78.

**C. The Federal Supply Schedule Contract Bidding**

The federal government uses federal supply schedule contracts ("FSS Contract") to ensure the supply of various materials to federal agencies. *Id.* ¶ 94. At issue is the FSS Contract issued on February 1, 2024. *Id.* ¶ 96. The five-year contract was for various forms of hydrocodone with APAP. *Id.* Bids for the contract were due on May 8, 2024, but the selection process continued into Fall 2024. *Id.* ¶¶ 96, 99. On May 8, 2024, Plaintiff submitted its bid for the FSS Contract. *Id.* ¶ 97. Defendants submitted a competing bid. *Id.* ¶ 101. Plaintiff alleged that Defendants refused to honor its APAP purchase order to prevent it from making its earlier bid on the FSS Contract or, failing that, to prevent Plaintiff from performing on that contract if awarded. *Id.* ¶ 103. In the end, Defendants were awarded the FSS Contract. *Id.* ¶ 105.

**D. The Present Action**

Plaintiff filed this action on November 5, 2025. *See generally id.* The Complaint asserts four causes of action under state and federal law: (Count I) Breach of the Oxycodone API contract against SpecGX; (Count II) Breach of the APAP contract against SpecGX; (Count III) Promissory estoppel, in the alternative, against both Defendants; and (Count IV) monopolization and/or attempted monopolization against both Defendants.

On January 23, 2026, Defendants moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). *See generally* ECF No. 26-1. With respect to Plaintiff's antitrust claims, Defendants raise four arguments in support of their motion. First, Plaintiff lacks antitrust standing because it failed to allege an antitrust injury. Second, Plaintiff failed to plausibly allege

that Defendants have monopoly power in the alleged FDF Products market. Third, Defendants' refusal to deal does not constitute anticompetitive conduct. And fourth, for its attempt claim, Plaintiff failed to plausibly allege that Defendants acted with the intent to monopolize the FDF Products market.

With respect to Plaintiff's state law claims, Defendants raise six arguments. First, Plaintiff failed to plausibly allege the existence of either the Oxycodone API or APAP contract. Second, the contracts are unenforceable because Plaintiff failed to satisfy all conditions precedent to Defendants' performance. Third, Plaintiff breached the APAP contract by not supplying Defendants with compliance information, which excused Defendants' performance. Fourth, Plaintiff waived its right to seek consequential damages, as it does here, due to a disclaimer in the APAP contract. Fifth, the statute of frauds bars Plaintiff's contract and promissory estoppel claims. Sixth, Plaintiff failed to plausibly state a claim for promissory estoppel. Plaintiff opposed the motion in all respects. *See generally* ECF No. 30.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads facts sufficient to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial plausibility demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Assessing plausibility under *Twombly* requires three steps. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, the Court must "take note of the elements the plaintiff must plead to state a claim." *Id.* (internal quotations and alterations omitted). Next, the

Court must "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, the Court must accept as true all "'well-pleaded factual allegations,'" draw all reasonable inferences from those allegations, and "'determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679) (alterations omitted). "If the well-pleaded facts do not nudge the 'claims across the line from conceivable to plausible,' the Court must dismiss the complaint." *Lynch v. Tasty Baking Co.*, No. 23-4445, 2024 WL 967842, at *2 (E.D. Pa. Mar. 6, 2024) (quoting *Twombly*, 550 U.S. at 570).

In deciding a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). However, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.*

## III. DISCUSSION

### A. Plaintiff's Antitrust Claims

Plaintiff brings claims for monopolization and attempted monopolization under Section 2 of the Sherman Act (Count IV). Defendants argue, *inter alia*, that Plaintiff failed to plausibly allege an antitrust injury, define the relevant product market, and demonstrate anticompetitive conduct. The Court agrees. Each defect provides an independent basis for dismissal.

#### 1. Antitrust Injury

All private antitrust plaintiffs must have antitrust standing. *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 269 (3d Cir. 2016). Assertion of an antitrust injury is a necessary, but not sufficient, condition of establishing antitrust standing. *Hanover 3201 Realty, LLC v. Vill.*

*Supermarkets, Inc.*, 806 F.3d 162, 171 (3d Cir. 2015), *cert. denied* 578 U.S. 1003 (2016). To allege an antitrust injury, a plaintiff must show "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury . . . which flows from that which makes defendant's acts unlawful." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (internal quotation omitted).

"The Sherman Act protects competition, not the competitor." *MHB Distribs., Inc. v. Parker Hannifin Corp.*, 800 F. Supp. 1265, 1271 (E.D. Pa. 1992) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). As such, "even the total elimination of one competitor[] is not sufficient to make a Sherman Act claim." *MHB Distribs.*, 800 F. Supp. at 1271 (internal quotation omitted). Rather, an antitrust plaintiff must assert an injury that "affected the prices, quantity or quality of goods or services, not just the plaintiff's own welfare." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 (3d Cir. 2022) (citation modified).

Here, Plaintiff failed to allege that it suffered an antitrust injury. Plaintiff alleged that Defendants' actions caused it "to lose actual sales to existing customers," prevented Plaintiff "from winning the FSS Contract," caused Plaintiff to lose a significant portion of its DEA Quota, "will cause shortages of FDF Products," "could allow Defendants to charge customers higher prices," and limited the choices of FDF Products available to customers. ECF No. 1 ¶¶ 87, 93, 107, 147, 156-57.

Plaintiff's loss of sales, a government contract, and a portion of its DEA Quota do not constitute antitrust injuries. "Such injuries to an individual competitor company, without allegations of injury to competition or consumer welfare, are insufficient as a matter of law to establish a violation of federal antitrust law." *Schuylkill Energy Res., Inc. v. Pa. Power & Light*

*Co.*, 113 F.3d 405, 413 n.6 (3d Cir. 1997) (internal quotation omitted).[1] Accordingly, "[t]hese allegations do not constitute [an] antirust injury." *Id.*

Plaintiff's allegations that Defendants' conduct "*could* allow Defendants to charge customers higher prices" and could result in "*potential* shortages of much-needed medication" are similarly unavailing. ECF No. 1 ¶¶ 91, 107 (emphasis added). Although these allegations are pleaded in terms of market price and quantity, Plaintiff concedes that these injuries are speculative. And "allegation[s] of speculative future antitrust injur[ies], especially in the context of a highly regulated industry, [are] insufficient to survive [a] motion to dismiss." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, No. 95-4885, 1996 WL 284994, at *4 (E.D. Pa. May 21, 1996), *aff'd* 115 F.3d 405 (3d Cir. 1997); *see also SEI Global Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 901-02 (E.D. Pa. 2020), *aff'd* 2022 WL 2356730 (3d Cir. June 30, 2022) (same).[2]

True, Plaintiff alleged that, due to Defendants' refusal to deal, Plaintiff was unable to fill approximately 450 orders for its customers. ECF. No. 1 ¶ 90. However, this allegation only provides factual enhancement to Plaintiff's assertion that it lost business. Plaintiff does not

---

[1] Moreover, Plaintiff's loss of the FSS Contract is not causally connected to Defendants' refusal to deal. Although Plaintiff asserted that this is the case, *see* ECF No. 1 ¶ 157, it has not plausibly alleged so. Plaintiff claimed that Defendants' refusal to honor Plaintiff's August 16, 2024, purchase order was meant to prevent Plaintiff from making its May 8, 2024, bid on the FSS Contract. *Id.* ¶¶ 54, 97, 103. That is impossible. Further, Plaintiff does not allege that, had Defendants fulfilled its purchase order, Plaintiff would have offered a more competitive bid, or that the Government's award of the FSS Contract to Defendants was the result of anything other than a competitive bidding process. *See Snyco, Inc. v. Penn Cent. Corp.*, 551 F. Supp. 949, 952 (E.D. Pa. 1982) (holding that there is no antitrust injury where the alleged decrease in competition "would have resulted even without the breach of contract").

[2] Plaintiff repeatedly refers to Defendants' ability to raise prices as giving rise to an antitrust injury. *See* ECF No. 30 at 16-17. However, the mere ability to raise prices is not unlawful under the antitrust laws. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

assert, for example, that its inability to fulfill those orders had any meaningful impact on market supply. Plaintiff's aggrieved customers could obtain their medication from other potential sources. Indeed, Plaintiff acknowledged a lack of market impact by describing the alleged shortages merely as "potential." *Id.* ¶ 91.

Finally, Plaintiff alleged that Defendants' conduct will negatively impact consumer choice. *Id.* ¶ 93. However, allegations that conduct "has the effect of reducing consumers' choices . . . does not sufficiently allege an injury to competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). This effect is "fully consistent with a free, competitive market." *Id.* (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 887, 895-97 (2007)). In the competitive marketplace, businesses fail or suffer financial setbacks that keep them from meeting demand for their products. This necessarily limits consumer choice. But that alone does not create an antitrust injury.

In sum, Plaintiff seems to "equate[] the harm to its business . . . with decreased competition." *SEI Global*, 496 F. Supp. 3d at 901. While Plaintiff may have suffered significant business harm from the Defendants' refusal to deal, that is not an antitrust injury.

**2. Monopolization**

Plaintiff likewise fails to state a claim for monopolization. To establish monopolization under the Sherman Act, a plaintiff must show that (1) the defendant possessed monopoly power in the relevant market, and (2) the defendant willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997), *cert. denied sub. nom. Baughans, Inc. v. Domino's Pizza, Inc.*, 523 U.S. 1059 (1998) (internal quotation omitted). Monopoly power is "the ability to control prices and

exclude competition in a given market." *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 434 (3d Cir. 2016) (internal quotation omitted). A plaintiff may show monopoly power through direct or indirect evidence. *Id.* Here, Plaintiff relies on indirect evidence.[3]

"To support a claim of monopoly power through indirect evidence, [a plaintiff] must show that (1) [d]efendants had market power in the relevant market and (2) that there were barriers to entry into the market." *Id.* at 435 (citation omitted).

**a. Relevant Market**

"The scope of the market is a question of fact as to which the plaintiff bears the burden of proof." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citation omitted). The relevant market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Interchangeability means that "one product is roughly equivalent to another for the use to which it is put." *Queen City Pizza*, 124 F.3d at 437 (citations omitted). Cross-elasticity of demand examines whether "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991).

Because market definition is a fact-intensive inquiry, "absent some obvious oversight in the pleadings, 'courts are cautious before dismissing for failure to define a relevant market.'" *Mayor & City Council of Balt. v. Merck Sharp & Dohme Corp.*, No. 23-828, 2023 WL 8018980,

---

[3] Plaintiff relies on market share and barrier to entry evidence to show monopoly power. *See generally* ECF No. 1 ¶¶ 144-46. And "market share and barriers to entry are merely surrogates for determining the existence of monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) (citing 2A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 531a (2006)).

at *8 (E.D. Pa. Nov. 20, 2023) (quoting *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018)). However, a complaint may be properly dismissed where the market definition fails to account for interchangeability or if the proposed relevant market "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Lifewatch*, 902 F.3d at 337 (internal quotation omitted).

Although "[n]ot every narrowly drawn market fails as a matter of law," "a plaintiff seeking to exclude supposed substitute products must plead facts distinguishing a proposed market from those supposed substitutes." *SEI Global*, 496 F. Supp. 3d at 893 (citing *Hanover*, 806 F.3d at 183); *see also Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008). For instance, in *Building Materials*, the Court dismissed the defendant's antitrust counterclaims for failure to justify its narrow market definition. 535 F. Supp. 2d at 525. The defendant alleged that "the relevant product market [was] asphalt shingle roof ridge vents." *Id.* However, the defendant did not "explain why asphalt shingle roof ridge vents [were] distinct from the market for shingle roof ridge vents, roof ridge vents in general or any other roofing products." *Id.*; *see also Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. 01–4254, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002) (same); *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 699-701 (E.D. Pa. 2021) (same).

Here, Plaintiff failed to justify its narrow market definition. Plaintiff alleged that the relevant product market is the market for FDF Products. ECF No. 1 ¶ 143. FDF Products consist of "(i) immediate release oxycodone with APAP tablets; and (ii) immediate release hydrocodone with APAP tablets." *Id.* Defendants argue that Plaintiff does not provide a rationale for excluding other pain medications from the market definition. EFC No. 26-1 at 11-12. The Court agrees.

As in *Building Materials*, Plaintiff failed to plead any facts that plausibly distinguish FDF Products from pain medications generally. Plaintiff alleged that "the choice of these FDF Products is largely determined by physicians and is based on the medical needs of the patient, not on the relative cost, the brand, or the manufacturer of the medication." ECF No. 1 ¶ 147.[4] That is insufficient to define an FDF Products market.

Under Plaintiff's logic, *all* prescription drugs would each constitute their own antitrust markets because a patient's access to those medications is always restricted by physician discretion and medical need. However, Plaintiff own market definition contradicts this logic because it seeks to include two prescription pain medications in the same market. Either a physician's prescriptive authority is truly limiting—in which case the two FDF Products cannot be in the same market—or it is not—in which case Plaintiff failed to provide any facts differentiating FDF Products from other pain medications.

Recognizing this inconsistency, Plaintiff alleged new facts in its Opposition to support its narrow market definition. *See* ECF No. 30 at 19-20, 19 n.7. However, these facts are not alleged in the Complaint. And "facts raised for the first time in opposition to a motion to dismiss cannot be considered." *Dates v. Winters*, No. 21-0037, 2022 WL 1157890, at *4 n.8 (E.D. Pa. Apr. 19, 2022) (citing *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

---

[4] Plaintiff also alleged that "a monopolist [in the FDF Products market] can impose a small, but significant, price increase . . . without causing patients to switch to a different supplier or other drug options." ECF No. 1 ¶ 148. However, this merely restates a method of determining the relevant market, a required element of Plaintiff's cause of action. "[I]f a hypothetical monopolist could impose a small but significant non-transitory increase in price ('SSNIP') in the proposed market, the market is properly defined." *F.T.C. v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 339 (3d Cir. 2016) (footnote omitted). These "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," cannot defeat a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because Plaintiff has failed to allege why FDF Products are "distinct from the market for [pain medication]," Plaintiff has failed to define the relevant product market. *Fresh Made*, 2002 WL 31246922, at *5.

**b. Anticompetitive Conduct**

Plaintiff's allegations of anticompetitive conduct are also flawed. To establish willful acquisition or maintenance of monopoly power, a plaintiff must prove that the defendant engaged in anticompetitive conduct. *Broadcom*, 501 F.3d at 308. "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* (citation omitted). Accordingly, "[c]onduct that merely harms competitors . . . while not harming the competitive process itself, is not anticompetitive." *Id.* (citation omitted).

Here, Plaintiff alleged that Defendants' refusal to deal constitutes anticompetitive conduct. ECF No. 1 ¶¶ 149-54. "[R]efusals to deal can sometimes establish an antitrust claim under Section 2." *Host Int'l*, 32 F.4th at 250. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). However, that right is not unqualified. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). There are two—and only two—instances in which a unilateral refusal to deal can give rise to antitrust liability: under *Aspen Skiing* or the essential facilities doctrine. *SEI Global*, 496 F. Supp. 3d at 896-97. Courts must be "very cautious in recognizing [these] exceptions" because they sit "at or near the outer boundary of § 2 liability" and are "in some tension with the underlying purpose of antitrust law." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-09 (2004).

### i. *Aspen Skiing*

To state a claim under *Aspen Skiing*, a plaintiff must show that (1) the defendant unilaterally terminated a voluntary and profitable course of dealing with its rival (2) under circumstances that suggest the termination resulted from the defendant's willingness to forsake short-term profits to achieve an anticompetitive end (3) in a market in which the defendant continues to sell its products to similarly situated customers. *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, No. 19-7532, 2024 WL 2861865, at *42 (D.N.J. June 6, 2024); *see also Host Int'l*, 32 F.4th at 250 n.7 (unilateral refusals to deal are actionable "only among competitors, and only if the parties have a history of dealing paired with facts suggesting 'a willingness to forsake short-term profits to achieve an anticompetitive end'" (quoting *Trinko*, 540 U.S. at 409)). "Termination of a relationship is not actionable unless the only conceivable rationale or purpose of it is to sacrifice short-term benefits in order to obtain higher profits in the long run from exclusion of competition." *SEI Global*, 496 F. Supp. 3d at 897 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016)) (citation modified).

Here, Plaintiff argues that this case falls squarely within *Aspen Skiing* because Defendants "abruptly and inexplicably" ended their preexisting course of dealing. ECF No. 30 at 22 (citing ECF No. 1 ¶¶ 6, 13-15). This, Plaintiff argues, entitles it to an inference that "Defendants' decision was irrational but for its anticompetitive effect." ECF No. 30 at 22.

Plaintiff is mistaken. Plaintiff does not allege that Defendants sacrificed the short-term benefits of continued dealing for higher profits in the long run. The only purported benefit that Plaintiff alleged Defendants received from its refusal to deal was winning the FSS Contract. Plaintiff submitted its bid for the FSS Contract on May 8, 2024. ECF No. 1 ¶ 97. And, although

the bidding process was still active when the parties were negotiating Plaintiff's August 16, 2024 APAP order, Plaintiff does no more than allege that these two events "coincided." *Id.* ¶¶ 54, 99, 101. Plaintiff alleged that Defendants' actions "served to prevent [Plaintiff] from winning the FSS Contract" and "would have restricted [Plaintiff's] ability to perform under the FSS Contract had [Plaintiff] eventually been awarded it." *Id.* ¶¶ 102, 157. But Plaintiff does not allege that it would have issued a more competitive bid or that it would have been awarded the contract but for Defendants' actions. Plaintiff's allegations fundamentally fail to connect these two events together.

Plaintiff also argues that Defendants' refusal to deal due to regulatory compliance concerns was merely "pretextual." ECF No. 30 at 22. In the Complaint, Plaintiff alleged that Defendants' more stringent review process "had not been required . . . in connection with prior purchase orders." ECF No. 1 ¶ 58. Plaintiff further alleged that, although Defendants' process would be appropriate for the sale of a Schedule II substance, it was "entirely irrelevant to the sale of non-controlled API, like APAP." *Id.* ¶ 61. As a result, Plaintiff claims that this new process was suspiciously "timed to coincide with the lucrative FSS Contract bidding" and was only meant to ensure that Defendants won the contract over Plaintiff. ECF No. 30 at 22.

However, Defendants explicitly informed Plaintiff of the reason for their change in procedure. *See* ECF No. 26-9 at 6. In a September 30, 2024, email, Defendants explained that "[d]ue to our Opioid Injunction, we have strict Compliance policies in place that require us to have these SOMQs updated annually and approved by our Compliance team prior to shipping APIs we manufacture to any of our Customers involved in manufacturing DEA controlled

finished products." *Id.*[5] Although Defendants recognized that APAP is not a controlled substance, they insisted on the SOMQ because "it can be used for combination products that do contain DEA Controlled active ingredients." *Id.*

As such, Defendants did not inexplicably change their ordering process as Plaintiff claims. Defendants told Plaintiff exactly why they insisted on more rigorous review standards. With this context, anticompetitive motivation is clearly not the only conceivable rationale behind Defendants' actions. Thus, Plaintiffs allegations regarding Defendants' ordering process cannot support its claim of anticompetitive conduct.

**ii. Essential Facilities Doctrine**

To state a claim under the essential facilities doctrine, a plaintiff must show "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996). "An 'essential facility' is one which is not merely helpful but vital to the claimant's competitive viability." *Monarch Ent. Bureau, Inc. v. N.J. Highway Auth.*, 715 F. Supp. 1290, 1300 (D.N.J. 1989), *aff'd* 893 F.2d 1331 (3d Cir. 1989) (citation omitted). "[T]he claimed input must be essential to the plaintiff competitor's survival in the market" and "must not be available from another source or be capable of being duplicated by the plaintiff or others." 7D

---

[5] Plaintiff's allegations specifically rely on that email in discussing Defendants' changes to its ordering process. ECF No. 1 ¶ 58. And although Plaintiff complains that Defendants introduced "material outside the four-corners of the complaint," ECF No. 30 at 1, Plaintiff does not dispute the authenticity of those materials. Accordingly, the Court may consider the content of that email in deciding Defendants' motion to dismiss. *See Pension Ben. Guar. Corp v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 773b (2026) (emphasis removed).

Plaintiff contends that Defendants' APIs are essential inputs. *See* ECF No. 30 at 24-25. The Court disagrees. In its Complaint, Plaintiff notes that Defendants are one of "several suppliers of API required to manufacture FDF Products." ECF No 1 ¶ 84. Although Plaintiff asserts that Defendants are "one of only two" suppliers "who can supply [Plaintiff's] market requirements," *id.*, "a facility is only 'essential' where it is otherwise unavailable." *SEI Global*, 496 F. Supp. 3d at 899. Because access to API for FDF Products is available through alternate sources—"'even if not in a way that is conductive to [Plaintiff's] existing business model—[Plaintiff] cannot establish an essential facilities claim.'" *Id.* (quoting *Aerotec Int'l*, 836 F.3d at 1185).

**3. Attempted Monopolization**

To state a claim for attempted monopolization, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom*, 501 F.3d at 317. The parties contest specific intent. However, because Plaintiff's failure to allege an antitrust injury, define the relevant market, and assert anticompetitive conduct provides the Court with ample reason to grant dismissal, the Court declines to reach the merits of this argument. *See Hanover*, 806 F.3d at 178 (antitrust injury); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 121 (3d Cir. 2021) (relevant market); *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 346 (3d Cir. 2018) (anticompetitive conduct).

#### 4. Leave to Amend

The Court will grant Plaintiff leave to amend its antitrust claims. Courts have broad discretion to grant leave to amend "when justice so requires." *See* FED. R. CIV. P. 15(a)(2). The Federal Rules express "a preference for liberally granting leave to amend" unless "amendment would cause undue delay or prejudice, or . . . amendment would be futile." *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000). "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988).

Amendment of Plaintiff's antitrust claims is not futile. The deficiencies that the Court identified are issue of fact, rather than law. Antitrust is a deeply fact-intensive area of law, and there may be important context missing from the Complaint necessary to fully and fairly evaluate Plaintiff's antitrust claims. Rather than focusing on harm to itself, Plaintiff can explain how Defendants' conduct harmed competition. Plaintiff can provide more facts, as it tried to do in its Opposition, to justify its market definition, or it could define the market more broadly. Plaintiff could also provide the Court with more context to plausibly show why an anticompetitive motive is the only plausible explanation of Defendants' refusal to deal.

### B. Plaintiff's State Law Claims

Plaintiff also brings state law claims for breach of contract and, alternatively, promissory estoppel (Counts I, II, and III). For Plaintiff's contract claims, Defendants argue that Plaintiff failed to plausibly allege that the Oxycodone API and APAP contracts existed, that they were breached, that they are enforceable, and that they entitle Plaintiff to consequential damages. Defendants further argue that Plaintiff failed to allege the existence of a promise, justifiable

reliance on that promise, and injustice for promissory estoppel. The Court disagrees. Accordingly, the Court will deny Defendants' motion to dismiss Plaintiff's state law claims.

**1. Choice of Law**

Before turning to the merits of Plaintiff's claims, the parties disagree whether Pennsylvania or Missouri law governs the Court's analysis. Plaintiff assumes Pennsylvania law applies while Defendants argue that Missouri law could "plausibly apply" because an APAP order acknowledgement included a choice-of law clause selecting Missouri law. ECF 30 at 5-6. Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219 (3d Cir. 2005). Under Pennsylvania law, the Court must first determine whether "the law of the two jurisdictions would produce the same result on the particular issue presented." *White v. Sunoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017) (internal quotation omitted). If the two laws would produce the same result, the Court should avoid the choice of law question. *Id.* As will be discussed, application of either Pennsylvania or Missouri law would result in denial of Defendants' motion. Therefore, the Court need not resolve the choice of law issue at this time.

**2. Breach of Contract**

To state a claim for breach of contract under Pennsylvania and Missouri law, a plaintiff must show (1) the existence of a contract, (2) breach of that contract, and (3) resultant damages. *AR Network, LLC v. Wireless Guardian*, No. 25-1447, 2026 WL 973498, at *42 (E.D. Pa. Apr. 10, 2026) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, PLLC v. L. Firm of Malone Middleman, PC*, 137 A.3d 1247, 1258 (Pa. 2016)); *CIBC Bank USA v. Williams*, 669 S.W.3d 298, 305 (Mo. Ct. App. 2023).

**a. Contract Formation**

*Oxycodone API Contract.* Pennsylvania and Missouri follow the traditional rules for offer and acceptance in contract formation. *See Lascoli v. Thomas A. Fahr Masonry Contractors*, 355 A.3d 975, 981 (Pa. Super. Ct. 2026) (citing *Glover v. Junior*, 333 A.3d 323, 339 (Pa. 2025)); *Johnson Heater Corp. v. Deppe*, 86 S.W.3d 114, 119 (Mo. Ct. App. 2002). Defendants argue that they never agreed to the Oxycodone API contract. They argue that, on November 6, 2024, before Plaintiff submitted their purchase order, their representative told Plaintiff that Defendants could not supply the Oxycodone API by the requested December 31 delivery deadline. ECF No. 26-1 at 18. Accordingly, Defendants argue that Plaintiff's November 6 purchase order cannot show acceptance of Defendants' offer.

Defendants misconstrue the Complaint. Plaintiff argues that the parties came to an oral agreement during their monthslong negotiations, evinced by their November 6, 2024, purchase order. Plaintiff does not allege that the contract was formed by that purchase order. The order merely evidences the existence of the contract. ECF No. 1 ¶ 49. The parties were negotiating the Oxycodone API contract since April 2024. *Id.* ¶ 39. Plaintiff alleged that Defendants required Plaintiff to obtain a DEA Quota to move forward with the purchase, that Plaintiff obtained that quota, and that SpecGX agreed to sell Plaintiff the API as authorized by the quota. *Id.* ¶¶ 40-42. Hence, the November 6 purchase order only confirms the existence of a prior agreement that came out of the parties' negotiations. And repudiation of an existing contract does not eliminate liability on that contract. *See Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178, 184 (Pa. 2015); *G.H.H. Inv. LLC v. Chesterfield Mgmt. Assoc., LP*, 262 S.W.3d 687, 695 (Mo. Ct. App. 2008). Drawing all inferences in favor of Plaintiff, the Complaint plausibly alleged that SpecGX and Plaintiff entered the Oxycodone API contract.

_APAP Contract._ Defendants next argue that the APAP contract fails as a matter of law because it is missing an essential term. In their acknowledgment of Plaintiff's August 16 purchase order, Defendants told Plaintiff that "an expected ship date will be provided" at a later time. ECF No. 26-1 at 19 (citing ECF No. 26-7 at 1). They argue that, because the parties never agreed to a date of performance, the purported contract is missing an essential term, rendering it too indefinite to enforce. ECF No. 26-1 at 19.

Under Pennsylvania law, a goods contract does not fail for indefiniteness because "one or more terms are left open." 13 Pa. Cons. Stat. § 2204(c). Contrary to Defendants' assertion, "Pennsylvania law does not mandate that an enforceable contract for goods include a provision for time of performance." *AR Network*, 2026 WL 973498, at *43 (citing Pa. Cons. Stat. § 2309). Defendants seem to confuse contracts for goods with contracts for services, which are governed by separate bodies of law. *See* ECF No. 26-1 at 19 (citing *Piccioli v. Faust Heating & A/C*, No. 2532 EDA 2022, 2023 WL 3270881, at *4-5 (Pa. Super. Ct. May 5, 2023) (discussing gas furnace repair services)). Missouri law is in accord. *See* Mo. Rev. Stat. §§ 400.2-204(c), 400.2-309 ("The time for shipment or delivery or any other action under a contract if not provided in this article or agreed upon shall be a reasonable time."). Therefore, the formation of the APAP contract does not fail merely because the parties did not agree on a delivery date. Both states have gap-filler provisions that impose a reasonable time of delivery in cases such as this.

**b. Conditions Precedent**

"It is well settled that if a contract contains a condition precedent, the condition precedent must occur before a duty to perform under the contract arises." *Keystone Tech. Grp., Inc. v. Kerr Grp., Inc.*, 824 A.2d 1223, 1227 (Pa. Super. Ct. 2003) (citation omitted). "[A] condition precedent is an act or event that must be performed or occur, after the contract has been formed,

before the contract becomes effective." *Kan. City Live Block 125 Retail, LLC v. Bhakta*, 476 S.W.3d 326, 332 (Mo. Ct. App. 2015).

Defendants argue that approval from their compliance team was a condition precedent of their performance under both contracts and that this event never occurred. ECF No. 26-1 at 19-21. However, Plaintiff alleged generally that "[a]ll conditions precedent have been performed or have occurred." *See* ECF No. 1 ¶¶ 121, 130. These general allegations are sufficient to survive a motion to dismiss. *Doe v. America PAC*, No. 25-1691, 2026 WL 49603, at *6 (E.D. Pa. Jan. 7, 2026). The Federal Rules provide that, "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." FED. R. CIV. P. 9(c). Although *Twombly* and *Iqbal* imposed a heightened pleading standard under Rule 8, that did not affect the general pleading standard under Rule 9. *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 112 (3d Cir. 2014). Accordingly, Plaintiff's allegations are sufficient.

**c. Breach**

"'When performance of a duty under a contract is due, any nonperformance is breach.'" *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 235(2)); *Harris v. Desisto*, 932 S.W.2d 435, 444 (Mo. Ct. App. 1996) (quoting same). Defendants argue that Plaintiff failed to allege breach of the APAP contract because SpecGX's order acknowledgement expressly permitted Defendants to withhold shipment if Plaintiff failed to provide all information requested by Defendants' SOMQ. ECF No. 26-1 at 21. Although Defendants contest the accuracy and sufficiency of Plaintiff's disclosure, they do not contest that Plaintiff provided Defendants with the requested information. *Id.* at 22.

In its Complaint, Plaintiff alleged that it provided Defendants with a complete SOMQ on October 2, 2024. ECF No. 1 ¶ 62. Plaintiff further alleged that it promptly responded to requests

for additional information from Defendants on October 4, 7, 11, and 24. *Id.* ¶¶ 63-68. If this was not enough, Plaintiff adequately alleged under Rule 9(c) that all conditions precedent on SpecGX's performance were satisfied, which included providing all required compliance information. *Id.* ¶¶ 121, 130. Despite this, SpecGX never sent Plaintiff any APAP pursuant to the contract. *Id.* ¶ 77. Therefore, Plaintiff has plausibly alleged breach of the APAP contract.

**d. Exculpation of Liability**

Under Pennsylvania and Missouri law, "'contractual provisions . . . excluding liability for special, indirect and consequential damages are generally valid and enforceable.'" *Lamb v. CVS Pharmacy LLC*, 704 F. Supp. 3d 606, 613 (E.D. Pa. 2023) (quoting *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 924 (Pa. Super. Ct. 1989)); *Warner v. Sw. Bell Tel. Co.*, 428 S.W.2d 596, 603 (Mo. 1968). However, such provisions are unenforceable for grossly negligent, willful, or wanton behavior. *Lamb*, 704 F. Supp. 3d at 616 (citation omitted); *Warner*, 428 S.W2d at 603 (willful, wanton, and reckless conduct). Defendants argue that, even if they breached the APAP contract, Plaintiff "waived the exact form of damages it seeks here." ECF No. 26-1 at 22. Defendants note that their acknowledgement of the APAP purchase order expressly disclaimed liability for lost profits, business interruption, or any other consequential damages resulting from a failure to deliver or a delay in delivering the APAP. *Id.* Plaintiff argues that it has pled enough for an inference that Defendants' conduct was willful or reckless and thus the exculpation clause is unenforceable. ECF No. 30 at 11. The Court agrees.

Plaintiff adequately alleged that all conditions precedent to SpecGX's performance have been satisfied. ECF No. 1 ¶¶ 121, 130. Taking all well-pleaded allegations as true, this would mean that (1) the parties engaged in monthslong negotiations for the Oxycodone API and APAP contracts (2) that culminated in Defendants' own compliance team approving the sales (3) after

which SpecGX simply refused to send the requested products. And the Court can infer that Defendants were not merely negligent because Plaintiff alleged that it repeatedly reached out to Defendants to demand performance. *Id.* ¶ 111. Accordingly, although Plaintiff seeks consequential damages for its breach of contract claims, *id.* ¶ 112, it is entitled to an inference that Defendants' breach was willful, wanton, or, at the very least, reckless. For the purposes of this motion, that is enough to allege Defendants are not exculpated from liability.

**e. Statute of Frauds**

Under Pennsylvania and Missouri law, "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is a record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." 13 Pa. Cons. Stat. § 2201(a); Mo. Rev. Stat. § 400.2-201(1). However, "[b]etween merchants if within a reasonable time a record in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents," the statute of frauds is satisfied unless the receiving party objects "to its contents is given within ten days after it is received." 13 Pa. Cons. Stat. § 2201(b); Mo. Rev. Stat. § 400.2-201(2).

*Oxycodone API Contract.* Defendants contend that the statute of frauds bars enforcement Oxycodone API contract because there is no written confirmation signed by SpecGX under Section 2201(a). Plaintiff correctly points out that Defendants' argument ignores Section 2201(b). All parties are merchants. And as discussed, the parties were in negotiations on the Oxycodone API contract since April 2024. During that time, Plaintiff alleged that the parties agreed to the terms of the Oxycodone API contract. On November 6, 2024, Plaintiff sent Defendants a confirmatory purchase order that evinced the existence of that agreement. ECF No. 1 ¶ 49. Defendants conceded and Plaintiff alleged that Defendants never objected to the

purchase order after it was received. *See* ECF No. 26-1 at 18.[6] Accordingly, the statute of frauds does not bar enforcement of the Oxycodone API contract.

*APAP Contract.* Defendants make the same argument that, because there was no agreed delivery date, there is no complete APAP contract to be enforced. *See* ECF No. 26-1 at 16. As stated above, Defendants' argument is without merit.[7]

**3. Promissory Estoppel**

Under Pennsylvania and Missouri law, to state a claim for promissory estoppel, a plaintiff must allege "(1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise." *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990); *accord City of Cape Girardeau ex rel. Kluesner Concreters v. Jokerst, Inc.*, 402 S.W.3d 115, 120 (Mo. Ct. App. 2013). These factors must be strictly enforced—there can be no "loose application" of promissory estoppel. *Peluso v. Kistner*, 970 A.2d 530, 533 (Pa. Commw. Ct. 2009) (citations omitted). Defendants argue that Plaintiff failed to plausibly allege any of these three elements. They are mistaken.

---

[6] Defendants may claim that they repudiated the contract before Plaintiff sent its confirmation. *Id.* But that does not eliminate their liability under the contract. *See Harrison*, 110 A.3d at 184 (discussing anticipatory breach); *G.H.H. Inv.*, 262 S.W.3d at 695 (same). The statute of frauds is a doctrine of contract enforceability, not formation. *Meiksin v. Howard Hanna Co.*, 590 A.2d 1303, 1307 (Pa. Super. Ct. 1991); *Int'l Plastics Dev., Inc. v. Monsanto Co.*, 433 S.W.2d 291, 294 (Mo. 1968) (en banc). And the Oxycodone API contract existed at the time of Defendants' repudiation. Therefore, Defendants' attempted repudiation did not negate the existence of the alleged Oxycodone API contract, and their failure to object to Plaintiff's confirmatory memo after it was received renders that contract enforceable.

[7] Defendants also contend that, because the statute of frauds bars Plaintiff's contract claims, it also precludes Plaintiff's promissory estoppel claim. ECF No. 26-1 at 17. Because Defendants are incorrect with regard to Plaintiff's contracts claims, they are necessarily wrong about its promissory estoppel claim.

First, Defendants argue that Plaintiff failed to allege the existence of a promise on which it could rely. ECF No. 26-1 at 23. Defendants accuse Plaintiff of making threadbare recitals of its cause of action. *Id.* While Defendants are correct that Plaintiff must present "facts to show the existence of an express promise," *id.* (quoting *Voltarelli v. Immaculata Univ.*, 614 F. Supp. 3d 158, 166 (E.D. Pa. 2022)).[8] Plaintiff has done so here.

Plaintiff alleged that Defendants agreed to supply the Oxycodone API and APAP, that Plaintiff provided all information necessary to complete Defendants' compliance review, and that Plaintiff's purchase orders confirm the essential terms of the agreement between the parties. ECF No. 1 ¶¶ 42, 44, 62-75, 114, 123. Plaintiff's allegations do not amount to a "broad and vague implied promise" insufficient to state a claim of promissory estoppel. *Bull Int'l, Inc. v. MTD Consumer Grp., Inc.*, 654 F. App'x 80, 100 (3d Cir. 2016) (internal quotation omitted). Plaintiff has alleged enough facts to plausibly show an express promise.

Furthermore, Defendants argue that a contingent promise is insufficient to state a claim for promissory estoppel. ECF No. 26-1 at 23. Whatever merit Defendants' argument may have, Plaintiff has adequately alleged that all conditions precedent to Defendants' performance have been satisfied. ECF No. 1 ¶¶ 121, 130. And "[a] conditional promise becomes absolute when the condition is performed." *Sun Oil Co. v. Traylor*, 180 A.2d 235, 237 (Pa. 1962). Moreover, Plaintiff has adequately alleged that SpecGX agreed to the purchase orders and that it would not have done so but for Plaintiff's compliance with Defendants' information requests. *Cf. Landan v. Wal-Mart Real Est. Bus. Trust*, 775 F. App'x 39, 44 (3d Cir. 2019) ("Wal-Mart did not make, or

---

8 *Accord Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (en banc) ("The promise giving rise to the cause of action must be definite, and the promise must be made in a contractual sense.").

at least Landan has not identified, any express promise to enter into any specified contract if Landan satisfied those conditions.”).

Second, Defendants argue that Plaintiff failed to allege justifiable reliance. “[J]ustifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction.” *K7 Design Grp., Inc. v. Five Below, Inc.*, 540 F. Supp. 3d 508, 513 (E.D. Pa. 2021) (quoting *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007)); *accord Pecos I, LLC v. Meyer*, 655 S.W.3d 579, 593 (Mo. Ct. App. 2022) (“Generally, reliance . . . is a question for the jury.”). Such issues generally “cannot be resolved on a motion to dismiss.” *Ne. Jet Ctr., Ltd. v. Lehigh-Northampton Airport Auth.*, 767 F. Supp. 672, 680 (E.D. Pa. 1991).

Here, Plaintiff plausibly alleged that the parties were negotiating a contract, Defendants requested additional compliance information, Plaintiff supplied that information, and Defendants did not make any additional requests thereafter. Combined with the fact that SpecGX allegedly agreed to supply the requested API in its discussions with Plaintiff, there is enough factual matter to infer that Plaintiff’s reliance on Defendants’ promises was justifiable.

Finally, Defendants argue that there is no injustice in refusing to enforce the purchase orders because Plaintiff’s inability to fill its customers’ orders is the result of its own mistaken assumptions and because Plaintiff could have switched to a different supplier. ECF No. 26-1 at 24-25. True, the cases that Defendants cite stand for the proposition that there is no injustice where a plaintiff bases its reliance on its own will or judgment, rather than the defendant's representations. *See, e.g.*, *Johnson v. Dunkin’ Donuts Franchising LLC*, No. 11–1117, 2014 WL 2931379, at *26 (W.D. Pa. June 30, 2014), *aff’d* 610 F. App’x 208 (3d Cir. 2015).

However, Plaintiff's allegations relate directly to Defendants' representations. Plaintiff did not pursue alternate suppliers because Defendants led it to believe that SpecGX would supply it with API. By the time that Plaintiff realized that Defendants had no intention to perform, Plaintiff alleged that it was too late to find a different supplier. ECF No. 1 ¶¶ 6, 32. The parties had been engaged in negotiations for months; repeating that process could not be done swiftly. As a result of this lack of supply, Plaintiff could not fill its customers' orders primarily because it relied on Defendants' promises to sell Oxycodone API and APAP. For the purposes of this motion, Plaintiff has alleged enough to show injustice.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss Count IV without prejudice. The Court will deny, however, their motion to dismiss Counts I, II, and III. An appropriate Order follows.

**BY THE COURT:**

MARY KAY COSTELLO
United States District Judge